IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2020 Session

**STATE OF TENNESSEE v. YANCEY LEE WILLIAMS II**

**Appeal from the Circuit Court for Lawrence County**
**No. 34163    David L. Allen, Judge**

---

**No. M2019-00091-CCA-R3-CD**

---

The Defendant, Yancey Lee Williams II, was convicted by a jury of first degree premeditated murder, for which he received a sentence of life imprisonment. On appeal, the Defendant argues that (1) there was insufficient evidence to support his conviction, specifically, challenging the element of premeditation; (2) the trial court erred by finding that he was engaged in unlawful activity and thereby omitting the "no duty to retreat" language from the self-defense instruction; (3) the prosecutor made improper and inflammatory comments regarding religion and race during closing arguments; and (4) plain error occurred when the State failed to provide pretrial documentation of a witness's statement to law enforcement despite an order being in place directing such disclosure. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Casey A. Long, Lawrenceburg, Tennessee, for the appellant, Yancey Lee Williams II.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Gary M. Howell and Christi L. Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The thirty-six-year-old victim, Curtis Ezekial Sirmones, Jr., was shot and killed on the evening of July 26, 2016. Thereafter, on October 26, 2016, a Lawrence County grand

jury charged the Defendant with the first degree premeditated murder of the victim.  See Tenn. Code Ann. § 39-13-202.  The Defendant proceeded to a jury trial in March 2018.

At the Defendant's trial, the State adduced the following proof.  The victim was the manager of a cattle farm he jointly owned with his mother, Susan Miller, and stepfather, Michael Miller, which was located on Williams Hill Road in Leoma.  They called the business "CSM Cattle Company."  There was an unoccupied house on the property the victim called "base camp," which was used for storage and had a kitchen for getting snacks and drinks.  The victim's home was 4.6 miles away from "base camp."

Among the victim's duties were hiring workers as needed and purchasing supplies and equipment through the farm's business account.  The victim had a debit or bank card for the business account, and the last withdrawal from the account was during the three-o'clock afternoon hour on July 26, 2016, for $300.  The victim's mother and stepfather also had their own debit cards for the farm's business account, though they never used them.

The victim's mother described the victim's hiring policy at the cattle farm: "Everybody deserved a chance. . . .  So we had people that had a rough time in life, and he hired them.  He gave them a chance."  The Defendant had worked for the victim in the past, and the victim had also employed the Defendant's wife, Cassaundra "Cassie" Williams, as a housekeeper.  According to the victim's mother, the victim helped the couple "out a lot."  The victim and the Defendant's wife had been friends for a long time.  It was also relayed that the Defendant's wife had the PIN number for the victim's debit card; he would let her use the card occasionally, presumably to make purchases for him.

The victim was six feet, three inches tall and weighed one hundred and eighty-two pounds.  He was a fairly "stout guy," being a former football player for Mississippi State University, where he played tight end and wide receiver; however, the victim could no longer play football after he injured his knee.  According to the victim's mother, the victim required multiple surgeries for his knee injury; he was in "constant pain"; he could no longer run; and at times, he would be unable to walk on it.  The victim's mother opined that if someone kicked the victim in his hurt knee, then he would not be able to walk but would "just fall to the ground."  Although the victim worked long hours and performed physical labor at the cattle farm, he wore a brace to do so.  He sometimes called his parents for help on the farm when his knee hurt.

On Tuesday, July 26, 2016, at 10:08 p.m., the Defendant, who lived on Mockerson Road in Five Points, called 911 on his cell phone.  He told the operator that he had shot the victim in self-defense.  The 911 call was admitted as an exhibit.

- 2 -

The Defendant reported to the 911 operator that he and the victim had been involved in a disagreement, that the victim arrived at his residence to engage in an altercation, and that when the victim pulled a gun on him, he disarmed the victim and shot him. The Defendant told the operator that the victim owed him money for some work that he had done for the victim and that the victim was accusing the Defendant of having stolen from him. The Defendant indicated that he shot the victim in the chest with a 9mm handgun, though he was not certain what kind of gun it was, as it was not his gun. The Defendant approximated that he had shot the victim three times in the chest. The Defendant said that the victim was lying in the flower bed and that the gun was on the porch.

The Defendant indicated that he wanted to call his wife so that she would not return home with their son, but dispatch advised him to stay on the phone with them. The Defendant can be heard telling someone who was on his property to leave the area.

The Defendant refused to approach the body to confirm signs of life because he feared the victim was not dead and would try to attack him again. The Defendant said, though, that the victim was "surely dead."

After the call was abruptly ended, the Defendant called 911 again. This second recording was also admitted as an exhibit.

While on the phone with 911, the Defendant walked toward a nearby store and briefly spoke with the manager, Mark Mashburn, who was in the parking lot. The Defendant approached Mr. Mashburn, though the Defendant stayed in his own yard. The Defendant told Mr. Mashburn that he had shot the victim, mentioning the victim by name. The Defendant claimed to Mr. Mashburn that he had done so in self-defense, stating, "He pulled a gun on me, and I took the gun and shot him." Mr. Mashburn told the Defendant not to come on store property, and Mr. Mashburn went back inside the store.

The Defendant assured the operator that he would cooperate with law enforcement and was told that they were on their way. The Defendant stood in front of the store in the middle of the Five Points intersection and waited for law enforcement to arrive. The Defendant informed the operator once law enforcement had arrived on the scene. The operator advised the Defendant to obey all commands and keep his hands up, which he did.

During the incident, Mr. Mashburn called 911 to confirm that the Defendant was indeed speaking with law enforcement because some time had passed and law enforcement had not yet arrived; this recording was also entered into evidence. At trial, Mr. Mashburn testified that while this was occurring, he saw a sedan leave the Defendant's property, stating that it was possibly a Buick or Oldsmobile. He did not see who was driving. Later, but still prior to law enforcement's arrival, Mr. Mashburn saw the Defendant's wife's

vehicle enter the Five Points intersection and then leave the area after speaking with the Defendant.

Lawrence County Sheriff's Department[1] Investigator Gary Mills testified that he, along with another deputy, responded to the call from the Defendant's address, arriving there at 10:22 p.m. Investigator Mills stated that he found the unresponsive victim lying in the "fetal position" in a flower bed next to the Defendant's porch; the porch was approximately three feet off the ground. Investigator Mills removed the victim, who was facing toward the house, from the flower bed, and he checked for a pulse and began chest compressions. According to Investigator Mills, when he began performing chest compressions, he heard blood going into the victim's chest cavity, so he assumed then that the victim was deceased. While Investigator Mills was tending to the victim, he heard the Defendant, who was in the parking lot of a nearby store, state, "I'm the shooter. I shot him." Other deputies took the Defendant, who was compliant, into custody.

Lawrence County Sherriff's Department Investigator Zach Ferguson was the lead investigator in this case. Investigator Ferguson, along with two agents from the Tennessee Bureau of Investigation, interviewed the Defendant at the sheriff's office around 1:00 a.m. on July 27, 2016, a few hours after the shooting. Investigator Ferguson described the Defendant's demeanor during the interview as "cocky or arrogant" and his being "eager" to convey his version of events. In his police statement, the Defendant claimed that earlier that day he had been in a verbal altercation with the victim at base camp over a $60 debt the victim owed him as partial payment for one ounce of marijuana. According to the Defendant, the victim had paid him $140 already but still owed him $60. The Defendant also claimed that the victim had accused him of stealing the victim's sunglasses and a camouflage pistol during their argument at base camp. The Defendant said that he left base camp after the victim shoved him. The victim then threatened the Defendant that "he was going to come and shoot [him]." The victim was "spun out on meth[amphetamine,]" in the Defendant's opinion.

When the Defendant and his wife returned to their residence, the Defendant sent his wife and stepson away and "got ready" for the victim's arrival. When the Defendant saw the victim pull up in his black truck, the Defendant went outside and placed his gun on a "sawhorse table" on the front porch. According to the Defendant, the victim came to the porch and pulled a silver gun from behind him. The Defendant stated that he kicked the victim in what he knew was his "bad knee" and took the gun away from him. However, the victim retreated to his truck, opened the door, and then turned around and started approaching the "side steps" to the porch while cussing the Defendant. The Defendant

---

[1] By the time of the Defendant's trial, Investigator Mills was employed with the Loretto Police Department.

stated that when the victim again reached behind him, the Defendant started firing at the victim and pulled the trigger until the gun was empty, possibly five times in total.

The Defendant informed the officers that when his wife returned home, he told her to leave. He also stated that while he was on the phone with 911, a blue car drove past and stopped. When the individual asked the Defendant what happened, the Defendant told "them to get the f--k out of there." The Defendant maintained that he did not know this individual's identity.

Jackie Schultz was a friend of the Defendant's wife and had attended a birthday party for her at the Williamses' home a few days before the shooting. Mr. Schultz had pitched a tent in their yard to the north side of the house, approximately fifty feet from the front porch steps.[2] Mr. Schultz went back to retrieve his tent on the evening of July 26th. Only the Defendant's wife's son, Matthew, was home at the time Mr. Schultz arrived around 5:00 p.m. that day.

Mr. Schultz planned to spend the night in the tent and take it down the next day. Mr. Schultz was inside the tent when the Defendant and the Defendant's wife arrived. Soon after their return, the Defendant's wife and her son left. The Defendant came over to Mr. Schultz's tent and told him that "[t]here's a n---er coming over here, and there's liable to be some trouble." Later, the Defendant came back outside and gave Mr. Schultz a handgun and stated, "I don't know what's going on, but you might need this." Mr. Schultz took the gun and put it in his tent. Mr. Schultz opined that the black handgun seen on the sawhorses was not the same weapon that the Defendant handed him, though he confirmed that the gun was dark-colored and in a holster.

Sometime after dark, Mr. Schultz heard the victim's truck pull into the yard. The victim, who looked upset, got out of the truck and started walking toward the house. Mr. Schultz began to follow him, but he retreated to his tent after the victim said, "Old man, you need to get back in that tent." Once back inside his tent, Mr. Schultz retrieved the weapon and stuck it behind him in his waistband. He could hear the victim saying something but could not make out the words, except that the victim sounded distressed and might have mentioned "money." Their voices were raised. After maybe a minute to a minute-and-a-half had elapsed, Mr. Schultz got out of the tent again. Mr. Schultz said that when he emerged, he did not see the Defendant because his view of the porch was obstructed by the corner of the house.

Mr. Schultz again started walking towards the victim, who started to walk slowly toward Mr. Schultz. The victim was not saying anything, and Mr. Schultz did not see a

_____

[2] This estimate was provided by Investigator Ferguson, but Mr. Schultz estimated that it was only twenty feet.

gun in his hand. He then heard "four shots" and saw the victim fall forward into the flower bed and land only two to three feet away from him. Mr. Schultz never saw the victim go up onto the steps or front porch of the residence; in fact, he never saw the victim move toward the porch.

Mr. Schultz first saw the Defendant "as soon as [the Defendant] came off the porch." The Defendant advised him that he "probably need[ed] to get out of [t]here." Mr. Schultz gave the gun back to the Defendant, got in his car, and left. He saw the Defendant talking on the phone as he drove away.

Mr. Schultz testified that he did not see the victim reach for anything or do anything to give the Defendant a reason to shoot him. Mr. Schultz did not pull out the gun he was carrying, and the victim could not have seen the gun. Mr. Schultz was not in the tent long enough for the altercation the Defendant had described to have happened. Mr. Schultz claimed that the following scenario was implausible:

> Suppose someone said that while you were in that tent [the victim] pulled a gun on [the Defendant], advanced up onto the porch with him. [The Defendant] Williams kicked him, took the gun away. [The victim] went back to his truck, perhaps retrieved another gun, came back out of his truck, and that's when you came out of the tent.

Mr. Schultz gave a statement to police on July 28, 2016; he acknowledged that he did not contact police for two days, claiming he "didn't know what to do." When he finally spoke with police, he was "[v]ery emotional, very shaken up, crying, beside himself." Mr. Schultz said that the Defendant shot the victim "for no reason." However, he also told the police that the victim "jumped out of the truck and started yelling at [the Defendant] about wanting his d--n money." He further relayed that when he returned inside his tent, he could hear the victim and the Defendant arguing; that upon exiting his tent, he could see the victim standing in the yard arguing with the Defendant who was on the porch; that the victim noticed him at that point and started walking toward him in an aggressive manner; and that he heard the Defendant telling 911 that he shot someone who was trying to break into the house. Mr. Schultz gave a second police statement on August 4, 2016, wherein he provided the information about the Defendant's giving him a gun.

Mr. Schultz acknowledged that he had consumed vodka, as well as a couple of beers, on the evening of the shooting. In addition, Mr. Schultz admitted that he was blind in his left eye, that it was dark when the victim arrived, and that the only light came from the porch. Mr. Schultz's preliminary hearing testimony was played for his recollection. He agreed that he had said at the hearing that he was inside the tent for three to four minutes and that when he came out of the tent the second time, the victim was approximately ten feet from the front porch.

Police found two semi-automatic pistols lying on the sawhorses on the front porch of the Defendant's residence. One of them was a silver-colored 9mm Smith & Wesson handgun with a black grip that was identified as belonging to the victim. When this gun was empty and the last casing had been ejected, the slide would automatically "lock[] back," which was the position of this weapon as it was found. The other pistol was a black 9mm "CZ"-model pistol of Czechoslovakian manufacture, which was sheathed in a black holster.

The victim's stepfather confirmed that the victim "routinely carried a pistol or sometimes two pistols in his truck" and that the victim's Smith & Wesson 9mm pistol was missing from the victim's gun safe. Police found a baggie containing "roughly half an ounce" of marijuana in the victim's truck, and a pair of sunglasses lying near the flowerbed where the victim's body was discovered. No gun was found inside the victim's truck.

Five of seven shell casings collected from the scene matched the victim's 9mm Smith & Wesson; the other two came from the black CZ pistol. No identifiable fingerprints were found on either pistol or the black holster; DNA results were also inconclusive.

The medical examiner found that the victim had died from two gunshot wounds, one of which entered his chest and one that entered his back. The wound paths were both downward. One bullet had remained in the body and was recovered during the autopsy; a firearms examiner confirmed that it had been fired through the victim's 9mm pistol. The medical examiner measured the victim's blood alcohol content from his femoral blood as .236 percent, approximately three times the legal limit for driving. The victim also tested positive for marijuana.

Christopher Johnson testified that earlier in the day on July 26, 2016, he was working for the victim at the family's farm. That evening after work, the victim and Mr. Johnson went to eat at the Brass Lantern in Lawrenceburg in the victim's truck, where they ate and imbibed some alcoholic beverages. As was his custom, the victim paid the bill and left the waitress a big tip. After leaving the restaurant, they stopped at a grocery store to buy beer and a liquor store to buy a bottle of Hennessy before heading to Mr. Johnson's girlfriend's mother's house, where Mr. Johnson made an online appointment for a "video visit" with his girlfriend, who was in jail. Both men drank some of the beer while at this location.

The victim left without saying anything, which upset Mr. Johnson because Mr. Johnson's car was at the victim's house. Mr. Johnson called his cousin for a ride. At some point, Mr. Johnson believed the victim texted him and asked him to bring the victim's sunglasses and bottle of liquor. Mr. Johnson tried to contact the victim, but he never got a response.

Mr. Johnson's route home took him by base camp, where he spotted the victim's truck in the driveway. No one else was there at that time. Mr. Johnson stopped, got out, and walked up to the victim's truck to give him his Oakley sunglasses and bottle of liquor. Mr. Johnson admonished the victim for leaving him stranded in town. However, the victim cut him off and said, "I don't want to put you in the middle of this, Chris." The victim then drove away abruptly. Mr. Johnson described the victim's demeanor as strange, noting that the victim usually only referred to Mr. Johnson by his nickname but that he used Mr. Johnson's "government name" on this occasion. Although the victim seemed "a little upset," Mr. Johnson did not think the victim appeared to be "drunk or stoned out of his mind" when the victim left base camp. Mr. Johnson confirmed that the victim frequently carried a firearm, sometimes two. Mr. Johnson indicated that the victim was capable of lifting heavy items.

Investigators learned from the victim's parents that there was a video surveillance system installed on a barn-type building next to the base camp house. The system was motion-activated. The recording, which was not always entirely clear due to lighting conditions, showed that at 7:45 p.m., a silver car drove up, stopping near the back porch of the house. A white female (identified as the Defendant's wife Cassie Williams) and a white male (identified as the Defendant) got out of the car. The Defendant and the Defendant's wife were mulling about the property, seemingly waiting on someone. At 8:04 p.m., a Black male (identified as the victim) drove up in his black Ford truck, "entering the drive with its tires spinning in the grass." The truck, which was being driven erratically, turned around and came to a stop next to the back porch. After the victim exited his vehicle, he and the Defendant started wrestling "in a playful manner." They three sit and drink and hang out together.

At 8:22 p.m., the Defendant's wife left in the silver car while the two males stayed at the residence. At 8:31 p.m., the Defendant took "a beer box out of the black truck and th[rew] it by the back porch." The Defendant and the victim then got inside the truck and stayed there "for some time." The silver car returned at 8:49 p.m., now dark outside. When the Defendant's wife arrived, the victim walked up to the car and appeared to kick the vehicle in an aggressive manner. The victim then looked around in his truck for something, while the Defendant's wife got out and retrieved a flashlight from her car. The Defendant, the Defendant's wife, and the victim all appeared to be searching for something. At one point, the victim "got in [the Defendant's] face" in an aggressive manner. The victim was gesticulating and pointing at the Defendant. At 9:11 p.m., a light came on inside the residence, and the Defendant and the Defendant's wife got in the silver Pontiac and left the property. For some time, the victim continued to look for something inside his truck before he left the house at 9:57 p.m.

The victim stopped briefly as he was leaving because another car had stopped in front of the house. Another individual (later identified as Mr. Johnson) exited the car and walked up to the victim's truck's window and handed something to the victim. The two converse momentarily before the victim leaned out the window, "yelled, nodded his head, slapped the side of the truck," and "peeled out" of the driveway.

Investigators obtained the Defendant's phone records. The records indicated that the victim and the Defendant spoke over the phone after the Defendant and the Defendant's wife left base camp. The call lasted nineteen seconds. When the victim called the Defendant back, the Defendant did not answer.

The investigators also recovered a series of text messages to and from the Defendant and the victim beginning at 9:17 p.m. that evening. The victim stated that he was "on [his] way to get [his] money." The victim indicated that his bank card was missing, as well as over $600 he had in his pocket, and that the Defendant better produce these missing items when the victim arrived. The Defendant replied, "All [your] stuff is at base camp. [You] owe me $60." The victim answered that he did not owe the Defendant anything, that the Defendant owed him, and that the Defendant was "short on everything." The victim again referenced his bank card and accused the Defendant of taking "way too much money." The Defendant angrily denied taking anything from the victim and said, "[You] so spun out[. You] don't know what is going on." The victim stated again that he was "on [his] way," noting once more that he previously had five to six hundred dollars in his wallet. The Defendant responded that the victim did not have either $200 or his sunglasses on his person.

The phone records further indicated that during this text message exchange, the Defendant called the victim at 9:35 p.m. and that the call lasted twenty-two seconds. The last text message from the victim, at 9:50 p.m., stated that he hoped the Defendant had his bank card.

The Defendant's text messages also reflected that he sent a text message to Andrew Gibson at 9:54 p.m., indicating that the Defendant's wife was on her way to drop off some money. At 10:16 p.m., Mr. Gibson responded that the Defendant's wife had only left $145, which was followed by a question mark, implying that she had not made complete payment.

A video recording from the liquor store showed the victim in possession of his money clip, cash, and driver's license when he purchased the bottle of Hennessey that evening. The Defendant's wife told Investigator Ferguson that they located the victim's debit card that evening in a bush at base camp. However, neither the victim's money-clip, his valid driver's license, nor his debit card were ever found by police or by his family. And although never found, the debit card had not been used since the victim's death.

That concluded the State's case-in-chief. Following the denial of the Defendant's motion for a judgment of acquittal, the Defendant called his wife to testify.

The Defendant's wife stated that she had known the victim for many years; the two of them had attended high school together. According to the Defendant's wife, she, the Defendant, and the victim were supposed to leave together for a vacation to the Gulf Coast that coming Friday.

The Defendant's wife relayed that she had often seen the victim drink to excess and that on those occasions, he became louder and was easily angered. That day, they had delivered a half-ounce of marijuana to the victim; she believed the sale price was $175. When she saw him at base camp that evening, he was very intoxicated, very angry, and irrational. The victim was angrier than she had ever seen him, and she described his shoving the Defendant, yelling, cursing, throwing things, kicking her car, and kicking a door inside the base camp house off its hinges. She testified that all of this started when the victim could not find a pair of custom Oakley sunglasses that had come in the mail that day. She claimed that she found the items the victim claimed were missing, including his cash, driver's license, and debit card, and showed them to him, but she "could not get through to [him]." She confirmed that she located the debit card in a bush close to the back porch steps.

After she and the Defendant left base camp, they went home, where she got her son and left because she was afraid that the victim was going to come to their house and continue trying to fight. She confirmed that the Defendant returned home with $145 in cash when he previously had none. When she left the residence, she went to deliver this cash to a man named Andrew Gibson, to whom they owed it for the marijuana.

The Defendant's wife testified that the victim had a reputation for fighting to "prove his point." One time, the victim had told her about his holding a man at gunpoint and walking him down to a creek over a drug debt. The man escaped and later paid the victim.

On cross-examination, the Defendant's wife testified that she saw a gun in the victim's truck while she was helping search for his missing items at base camp. The State then asked the Defendant's wife about the drive back to their residence from base camp that evening. The Defendant's wife confirmed that "[a]t some point during that drive, [the Defendant] reached down beside the seat and pulled up a gun that [she] recognized as belonging to [the victim.]" According to the Defendant's wife, the Defendant then said, referring to the victim, "That n---er's taking his last breath tonight."

On redirect examination, defense counsel confirmed with the Defendant's wife that she had previously given a police statement. The Defendant's wife agreed that she said nothing in that statement about her seeing the victim's gun on the drive back to their

residence or about the Defendant's making any statement of his intent to kill the victim. Her police statement was then admitted as an exhibit.

Upon further examination by defense counsel, the Defendant's wife acknowledged that she had engaged in "communications with law enforcement" that led her to believe that she might be charged in connection with the victim's missing items and death. The Defendant's wife indicated that she had spoken with the prosecution about these events several times, as well as speaking with defense counsel on several occasions. The following colloquy then ensued:

> Q. During the course of your communications with me, isn't it true that at no point in time have you mentioned that [the Defendant] pulled a gun out—while you guys were in the car driving that night--of [the victim's]?
> A. I thought we had this conversation in my living room. If we didn't—looking at your face, no, sir, I did not.
> Q. Okay.
> A. And if I didn't, that's my bad.

The Defendant's wife confirmed that these would have been extremely important facts to mention. The Defendant's wife agreed that she was motivated to provide such information at trial because she feared prosecution, although the Defendant's wife subsequently clarified that she was also motivated by a desire to do the right thing.

Upon further redirect examination, the Defendant's wife was asked when she first told "anyone in law enforcement or connected to law enforcement, including the district attorney's office, about this alleged gun that [she] saw in the car?" The Defendant's wife answered, "Fall time. As far as an exact time, end of summer/first of fall." She acknowledged that the timing coincided with "approximately the same time that [she] began engaging in an additional romantic relationship" outside of her relationship with the Defendant.

The Defendant next called Jimmy McMasters, who testified about an incident when the victim held him at gunpoint because the victim believed he had stolen drugs from him. Mr. McMasters paid the victim $500 to leave him alone. Mr. McMasters feared that the victim would seek retribution if he reported the event to law enforcement.

The Defendant then testified. The Defendant indicated that the victim was a taller and stronger person than he was and that he had witnessed the victim perform at least one feat of strength that the Defendant did not believe that he could perform, that being when the victim chased down, tackled, and held down a calf. The Defendant testified that he was aware of the victim's history with Mr. McMasters. In addition, the Defendant stated that he knew the victim to commonly carry more than one firearm in his vehicle.

- 11 -

According to the Defendant, when the victim arrived at base camp that evening, he appeared intoxicated. Because music was playing over the victim's truck's radio, the victim grabbed the Defendant by the arm, and they sort of danced for fifteen minutes or so. When the Defendant's wife left base camp to get "cigarellos" to roll the marijuana, the Defendant and the victim talked about their impending vacation. The Defendant said that during this time, the victim had laid "a big pile of stuff on the porch that he had pulled out of his pockets," including his money clip, keys, and marijuana. They both got inside the truck and listened to the radio. The victim then "reached up on his head and figured out he didn't have his shades," so they began to look for them.

The Defendant looked in the truck bed. He said that he "he ended up dumping the cooler" and got himself and the victim a beer, which they got back in the truck to drink. As the victim continued to look for his sunglasses, he accused the Defendant of being with him all day and taking his sunglasses. When the Defendant said to the victim that the victim was mistaken, that they had not been together all day, nor did he have the victim's sunglasses, the victim began to get agitated. The Defendant explained, "It was like a light switch flipped." The victim started throwing things and frantically looking for his sunglasses and debit card.

When the Defendant's wife returned from the store, the victim "appeared to jump and lunge at the car," kicking the car and yelling something at her. The three of them continued to search for the missing items, and the Defendant's wife located the victim's debit card. Thereafter, the victim and the Defendant were sitting in the truck, and according to the Defendant, the victim got "up in [his] face" and shoved him. The Defendant claimed that in response, he just threw his hands up and asked what was wrong with the victim. When the victim went inside base camp and kicked the kitchen door off its hinges, the Defendant and his wife got in their car and left.

The Defendant testified that when he returned home, he started to receive the victim's threatening text messages. The victim arrived at the Defendant's home thirty to forty-five minutes after the Williamses had left base camp. At that time, the victim was yelling at the Defendant about his owing the victim money. The Defendant claimed that he had never seen the victim that angry before, and therefore, he thought that the victim might have been high on methamphetamine. When the victim attempted to aggressively come onto the Defendant's porch, the Defendant kicked the victim in his injured knee, and the victim drew a gun from behind his back. The Defendant maintained that he was able to wrestle away the gun from the victim, who responded by trying to strike and grab him. According to the Defendant, the victim went back to his truck, rifled around in the truck, came back around towards the porch, and made a motion that made the Defendant believe that he was drawing another firearm, at which time the Defendant "just started squeezing the trigger." The victim was about eight feet away. The Defendant said that as he finished

firing four or five shots, the victim "spun away from [him] and fell on his side" into the flower bed.

The Defendant denied having the victim's gun as stated by his wife and denied saying that he was going to kill the victim. The Defendant claimed that he did not mention to the police that Mr. Schultz had witnessed the shooting because he did not want to get him in trouble. The Defendant could not recall the substance of his phone conversations with the victim after the Defendant left base camp that evening.

The Defendant acknowledged that in his police statement, it was stated that he sold the victim one ounce of marijuana and that this dispute began over payment. However, the Defendant said that he did not catch the error in the statement regarding the amount, but he asserted that he only sold the victim one-half of an ounce, not one ounce. The Defendant admitted that the police specifically asked him if there was anyone else there when he shot the victim and that he was not forthright when he failed to tell them about Mr. Schultz's being present.

Following the conclusion of the proof, the Defendant was convicted as charged of the victim's murder, for which he received a sentence of life imprisonment. After denial of the Defendant's timely motion for new trial, this appeal followed.

ANALYSIS

The Defendant presents the following issues on appeal: (1) whether there was insufficient evidence to support his conviction, specifically, challenging the element of premeditation; (2) whether the trial court erred by finding that he was engaged in unlawful activity and thereby omitting the "no duty to retreat" language from the self-defense instruction; (3) whether the prosecutor made improper and inflammatory comments regarding religion and race during closing arguments; and (4) whether plain error occurred when the State failed to provide pretrial documentation of a witness's statement to law enforcement despite an order being in place directing such disclosure. We will address each in turn.

*I. Sufficiency*

The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for first degree premeditated murder, specifically, challenging the element of premeditation. The Defendant submits that his wife was an uncharged accomplice and that her testimony as to premeditation, that being his alleged statement to her that "[t]hat n---er's taking his last breath tonight," was uncorroborated. The Defendant continues that absent the Defendant's wife's testimony regarding his state of mind, Mr. Schultz's testimony that the victim was unarmed and that the Defendant sent Mr. Schultz

away before the police arrived failed to provide sufficient proof of premeditation. The Defendant, in support of his argument, references his own testimony that he believed the victim was armed "as [he] had already had to wrestle the gun away from [the victim] moments before the shooting." Finally, the Defendant avers that because the Defendant's wife was a defense witness, the trial court should have granted his motion for a judgment of acquital at the close of the State's case-in-chief.[3]

The State responds that because the Defendant chose to present evidence on his behalf, he is now limited to challenging on appeal the sufficiency of the evidence based upon all the proof submitted. Moreover, according to the State, based upon all of the evidence presented, the element of premeditation was sufficiently established.

In deciding a motion for judgment of acquittal, the trial court must determine the legal sufficiency of the evidence. State v. Collier, 411 S.W.3d 886, 892 (Tenn. 2013). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Little, 402 S.W.3d 202, 211 (Tenn. 2013). A distinction arises between a challenge to the sufficiency of the convicting evidence and a challenge to the trial court's denial of a motion to acquit only when the defendant introduces proof after the State rests its case. A motion for judgment of acquittal is waived if the defendant introduces proof after making the motion. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007). When the defendant does not stand on a motion for judgment of acquittal, the appellate court may then consider evidence introduced after the close of the State's case-in-chief in assessing the sufficiency of the evidence. See Collier, 411 S.W.3d at 893. The defendant may, of course, still challenge the sufficiency of all evidence introduced at trial. State v. Gilley, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008).

In this case, the Defendant testified after the State rested its case, and the Defendant called his wife and Mr. McMasters to testify. On review, we consider all the proof introduced at trial in evaluating the sufficiency of the evidence supporting the verdict. Accordingly, we agree with the State that the Defendant's challenge is simply one to the sufficiency of the evidence.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor

---

[3] The Defendant states these as separate issues in his brief, but for the sake of clarity and brevity, we have combined them to be dealt with jointly.

- 14 -

of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial

- 15 -

evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

In support of his challenge to the sufficiency of evidence, the Defendant contends that the trial court made a finding that his wife was an accomplice, and he asserts that her testimony as to premeditation was uncorroborated. It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34,43 (Tenn. 1964)). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted). Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

The Defendant cites to the trial judge's administrative Rule 12 report as evidence that the trial court found that the Defendant's wife was an accomplice. See Tenn. Sup. Ct. R. 12.[4] However, the Defendant did not request a jury instruction concerning the

---

[4] Tennessee Supreme Court Rule 12 requires trial courts to file extensive reports in all cases in which a defendant is convicted of first degree murder. These reports include data about the crime, the defendant, and the punishment imposed. See Tenn. Sup. Ct. R. 12(1) and the appendix thereto.

accomplice corroboration rule at trial. Furthermore, corroboration of accomplice testimony was not incorporated in the Defendant's sufficiency argument during the motion for new trial phase. Importantly, the Defendant, as the State aptly notes, cites to no authority on appeal that permits a finding in the trial judge's administrative Rule 12 report to be considered a ruling on the merits of the case. We agree with the State that this finding, by itself, does not establish that Defendant's wife was an accomplice to the murder.

That being said, there was more than adequate evidence to connect the Defendant with the crime charged, including testimony from an eyewitness, the physical evidence, and the Defendant's own statements to 911 and law enforcement personnel. The Defendant's argument, however, is confined to whether there was sufficient corroboration for his wife's testimony regarding premeditation. "That is not necessary because, as noted above, our case law does not require corroboration for every element of the crime." State v. Alejandro Chevo Guana, aka Alejandro Chevo Gouna, No. W2008-01304-CCA-R3-CD, 2010 WL 2593631, at *14 (Tenn. Crim. App. June 29, 2010) (citing Bigbee, 885 S.W.2d at 803). "Rather, all that is necessary is that there be 'some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated.'" Id. (quoting Bigbee, 885 S.W.2d at 803). Such independent facts are present in this case.

Moreover, we are not persuaded that the Defendant's wife's testimony regarding the Defendant's prior possession of the victim's gun and the Defendant's statement that "[t]hat n---er's taking his last breath tonight" provided the only evidence of premeditation in the case. The victim and the Defendant had been involved in a disagreement, which was confirmed by the text messages exchanged between the two in the hour before the shooting. The video recording from base camp further confirmed that the disagreement was becoming agitated and hostile. Apparently, the victim believed that the Defendant had "shorted" him in a marijuana deal, as well as having stolen his debit card and cash. The victim told the Defendant he was coming to the Defendant's residence to collect his money and property. Believing that trouble was going to ensue, the Defendant sent his wife and stepson away from the residence and provided Mr. Schultz with a handgun.

Mr. Schultz's account, an eyewitness to the shooting, was completely contrary to the Defendant's. Mr. Schultz said that the victim appeared unarmed and that the victim never went on the porch or moved aggressively toward the Defendant. According to Mr. Schultz, the victim did not do anything to provoke the shooting. The Defendant told Mr. Schultz to leave the area before the police arrived, and the Defendant withheld Mr. Schultz's identity from the police. The victim was shot once in the back and once in the front. Multiple shell casings were recovered at the scene, and the Defendant admitted to firing multiple shots, discharging the firearm until it was empty. Five shell casings fired through the victim's gun were found at the scene. The Defendant did not render aid to the

victim; he would not confirm signs of life despite his belief that the victim was surely dead. Investigator Ferguson said that the Defendant was cocky and arrogant during his police interview.

The jury was free to reject the Defendant's claim of self-defense. We find the proof, in the light most favorable to the State, sufficient to establish that the Defendant premeditatedly and intentionally killed the victim.

*II. Self-Defense Instruction*

The Defendant contends the trial court erred in finding he was engaged in unlawful activity and omitting the portion of the self-defense instruction stating he had no duty to retreat. The State contends the trial court properly modified the jury instruction.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). The trial court's duty to fully instruct the jury extends to general defenses, including self-defense. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

Tennessee's self-defense statute provides, in pertinent part, as follows:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611. The statute does not define "unlawful activity."

In State v. Perrier, our supreme court clarified that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat" rather than a complete bar to self-defense. 536 S.W.3d 388, 401 (Tenn. 2017). "[A] duty to retreat does not mean that a person cannot defend herself or himself." Id. at 404. Consistent with the common law duty to retreat, a defendant engaged in unlawful activity "must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of" using force. Id. (quoting State v. McCray, 512 S.W.2d 263, 265 (Tenn. 1974)). The trial court must make a threshold determination of whether a defendant was "engaged in unlawful activity" as part of its decision whether to charge the jury with the no duty to retreat. Id. at 403. In addition, this court has held "that a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct the jury that the defendant had a duty to retreat." State v. Tyshon Booker, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *27 (Tenn. Crim. App. Apr. 8, 2020), perm. app. filed (Tenn. June 8, 2020).

The Tennessee Pattern Jury Instructions on self-defense provide, in relevant part, as follows:

Included in the defendant's plea of not guilty is [his][her] plea of self-defense.

If a defendant was in a place where he or she had a right to be, he or she would have a right to [threaten][use] force against the [deceased][alleged victim] when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's [use][attempted use] of unlawful force. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before [threatening][using] force.**]**

[If a defendant was in a place where he or she had a right to be, he or she would also have a right to [threaten][use] force intended or likely to cause [death][serious bodily injury] if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger

- 19 -

creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before [threatening][using] force likely to cause [death][serious bodily injury**]**.]

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b).

Here, after the close of the State's proof, the trial court and the parties engaged in an extensive discussion of the self-defense jury charge, including whether the Defendant was engaged in unlawful activity at the time of the shooting. The State argued that the Defendant was engaged in two forms of unlawful activity at the time—a dispute involving the sale of an ounce of marijuana and theft of the victim's debit card, money clip and cash, driver's license, sunglasses, and camouflage pistol. Ultimately, the trial court found the theft argument "too weak" to establish that the Defendant was engaged in unlawful activity. However, the trial court determined that the Defendant "was engaged in an ongoing dispute over a sale of marijuana where he may have shorted the victim, and I think the time nexus is certainly a reasonable timeframe to tie the two together. So I do find that [the Defendant] was engaged in unlawful conduct." The trial court found that the ongoing dispute over a drug transaction had been established by clear and convincing evidence, noting that the Defendant admitted to selling the victim an ounce of marijuana, but that only a half-ounce was found in the victim's truck, and that the victim sent text messages to Defendant about being "short on everything." Based on this finding, the trial court removed the bracketed language from the Tennessee Pattern Jury Instruction.

At the motion for new trial hearing, the Defendant argued that the trial court's ruling that he was engaged in unlawful activity was in error. Defense counsel argued that the drug transaction had already been completed and that "the parties ha[d] parted ways." Defense counsel indicated that the State had also made "a slight hint of a suggestion that there had been a theft of some kind." The trial court replied that "at the very least, [the] Defendant was in possession of stolen property" given the Defendant's wife's testimony that he showed her the victim's gun. Although the trial court agreed that the argument was not made by the State at the close its case-in-chief,[5] the trial court determined that the Defendant was involved in unlawful activity on that basis even if it was not identified by the State at that time. The trial court concluded,

> I agree with the [S]tate that there was at least some proof that the drug deal
> or the stolen property dispute was still ongoing, but even more clearly than

---

[5] The Defendant's wife had not yet testified.

that, based on [the Defendant's wife's] testimony that [the Defendant] showed her the gun he stole from [the victim] and at the time of the killing that was possessed by [the Defendant], he possessed stolen property and if it is error on my part to—assuming I'm wrong about the drug deal proof—to use the wrong reasoning to get to the right result, I think I'm right on that.

The Defendant argues that the trial court erred by finding that he was engaged in unlawful activity because the drug sale had been completed when the marijuana was delivered to the victim, the Defendant had received payment, and the parties went separate ways from base camp after the exchange. According to the Defendant, when the victim arrived at the Defendant's house approximately forty-five minutes later, the drug transaction was no longer ongoing despite the victim's belief that he had been "shorted." We disagree.

In Perrier, our supreme court analyzed other jurisdictions' self-defense statutes that contained similar "unlawful activity" language relating to the duty to retreat. See 536 S.W.3d at 400-01. In finding that a person must not be engaged in unlawful activity as a necessary perquisite for a person's foregoing any duty to retreat, the Perrier court cited with approval a case in which "the Kentucky Supreme Court determined that a defendant collecting payment for previously-delivered heroin was engaged in unlawful activity and was not, therefore, entitled to a 'no duty to retreat' jury instruction." Id. at 401 (citing Jackson v. Commonwealth, 481 S.W.3d 794, 798 (Ky. 2016)). The circumstances present here are similar. The proof supports a conclusion that the Defendant was engaged in the unlawful activity of selling drugs and that his need use to self-defense was causally-connected to the ongoing dispute over the exchange of drugs.

The Defendant also takes issue with the trial court's determination at the motion for new trial hearing that the unlawful activity related to the Defendant's possession of stolen property, i.e., the victim's handgun. The Defendant's wife testified that the Defendant showed this weapon to her while they were en route home from base camp that evening and that the Defendant said to her that "[t]hat n---er's taking his last breath tonight." Forensic examination confirmed the victim's gun as the murder weapon. Certainly, the Defendant's possession of this stolen property can be causally-connected to the shooting.

The Defendant again cites to the accomplice-corroboration rule and maintains that the trial court erred in relying on the Defendant's wife's testimony about the stolen gun absent sufficient corroboration. The clear and convincing evidence standard is met when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). In rejecting a similar argument in the context of corroboration of Rule 404(b) evidence, this court noted that the accomplice-corroboration rule applied to criminal convictions and held that there was "no authority suggesting that corroborating testimony [was] necessary" for admission

- 21 -

of Rule 404(b) evidence. See, e.g., State v. Jose Rodriguez and Eladio Caballero Sanchez, No. M2005-00951-CCA-R3-CD, 2006 WL 2310666, at *12 (Tenn. Crim. App. Aug. 7, 2006). Likewise, we hold that the accomplice-corroboration rule does not apply to the threshold determination of unlawful activity for purposes of the duty-to-retreat language of the self-defense statute.

Because the Defendant was engaged in unlawful activity, to wit, either an ongoing drug transaction or possession of a stolen handgun, at the time of the offense, he had a duty to retreat before engaging in self-defense. Accordingly, the trial court properly instructed the jury by removing the bracketed language from the pattern instruction.

*III. Closing Arguments*

The Defendant argues that the State's comments during closing argument were improper and prejudicial because the State was attempting to "inject broader issues such as religion and race to upset the jurors and cloud the issue of guilt or innocence." Specifically, the Defendant submits that the prosecutorial misconduct occurred when the prosecutor characterized defense counsel's "use of the phrase 'by the grace of God' as blasphemous" and when the prosecutor "invok[ed] racially charged terms such as 'n---er' at every opportunity."

The State responds that the Defendant has waived review of these comments by failing to compile an adequate record for our review, by failing to raise contemporaneous objections, and by failing to challenge the use of the racial epithet during the motion for new trial phase. The State further submits that plain error relief is not warranted. We agree with the State.

The Defendant's closing statement, in part, included the following statement:

> This shooting didn't occur until [the victim] had already pulled the gun on [the Defendant]. [The Defendant], by the grace of God, had managed to wrestle it away from him, wrestle it away from the next college football star who was a good deal bigger than him, who was very likely stronger than him, who was definitely faster than him, who had a history of violence, who had held someone at gunpoint previously that he knew of. By the grace of God he manages to get the gun away from that man. The man goes back to his truck, rifles around the truck.

In rebuttal, the prosecutor responded to such closing statement by stating, "[Defense counsel] did say something that just floored me. [The Defendant] killed [the victim] with the aid of God's grace." Apparently, the prosecutor went on to accuse defense counsel of "blasphemy." At the motion for new trial hearing, defense counsel noted that the

"blasphemy" remark did not appear in the printed transcript.  However, the prosecutor admitted to using the word, and the trial court remembered it.  Defense counsel stated at the motion for new trial hearing that he intended to obtain an audio recording of the proceedings to correct the transcript, but it does not appear from the record before us that any such action was ever taken.  No discussion took place as to whether any objection was ever lodged at trial to the statement.  Ultimately, in ruling on the issue, the trial court "conclude[d] that, in the context in which the State made the 'blasphemy' statement, that said statement was not inflammatory."

The Defendant did not raise as an issue in his motion for new trial or argue at the hearing any error as it related to the prosecutor's use of the racial pejorative "n---er" during closing argument.  From the portion of the closing argument transcribed, the prosecutor twice used this term.  During the first instance, the prosecutor specifically recited the Defendant's statement to his wife, commenting, "[The Defendant] thought his wife was in on the secret, shows her the gun and says, 'That n---er's gonna take his last breath tonight.'"  The second instance occurred when the prosecutor stated as follows:

> What's the secret?  The secret is this guy, this guy (indicating.)  This dutiful son, this doting father, this local football hero, this hardworking farmer, this kind and generous friend who would give you a refrigerator if you need one, who would give you a job when nobody else would, this Lawrence County man—you know what the secret is?  After all that, he's just a n---er.

The Defendant has waived plenary review of his issues.  First, the prosecutor's rebuttal argument was not transcribed in its entirety; an error acknowledged but never remedied.  Thus, we cannot place the argument into its complete context.  It is the duty of the appellant to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal.  Tenn. R. App. P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999).  Furthermore, it does not appear that the Defendant raised a contemporaneous objection during closing argument to any of the challenged comments.  No objection was made during the portion of the argument transcribed, and neither counsel nor the trial court gave any indication that an objection was made during the portion not transcribed.  See Tenn. R. App. P. 36(a) (providing that appellate relief is not available for a party who "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error"); State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004) (holding that the issue of prosecutorial misconduct during closing argument is waived if the defendant does not make a contemporaneous objection).  Finally, the Defendant did not challenge the prosecutor's use of the racial epithet during the motion for new trial phase, resulting in yet another ground for waiver regarding those comments. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a

jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion). Accordingly, the Defendant is not entitled to relief on appeal unless the prosecutor's remarks constitute plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

There are five factors that must be established before an error may be recognized as plain:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 70 (Tenn. 2018) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016); State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). Furthermore, the error must be "clear" or "obvious," State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial," Smith, 24 S.W.3d at 283.

Our supreme court has summarized prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin,

Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005).

Here, the prosecutor's comments were not so inflammatory as to affect the outcome of the trial. First, it was defense counsel in his closing argument who injected the issue of whether the Defendant received the "grace of God" when he disarmed the victim, and the prosecutor's use of the religious term "blasphemy" was seemingly made in response to that argument. Moreover, the trial court indicated that the context in which the blasphemy statement was made was not inflammatory. As for the prosecutor's use of the racially offensive term "n---er," it was the Defendant himself who referred to the victim as such. Because the prosecutor's first reference was merely quoting the Defendant, it cannot be viewed as an improper commentary on the evidence. However, the Defendant's use of the term did not provide the prosecutor with unlimited freedom to use the racial pejorative. Both the tone and tenor of the prosecutor's second usage of the term did not appear to comport with counsel's duty to advocate within the parameters of courtroom propriety and decorum. See, e.g., State v. Daron Lekithe Moss, No. W2018-00038-CCA-R3-CD, 2018 WL 4600903, at *6 (Tenn. Crim. App. Sept. 25, 2018) (noting same regarding a prosecutor's sexually provocative language involving a teenage-boy rape victim).

Regardless, these comments do not rise to the level of affecting the verdict in this case. Although the Defendant alleged self-defense, the victim was shot once in the back and once in the chest. The Defendant shot multiple times and discharged the weapon until it was empty. He stated his intent to kill the victim, and the eyewitness observed no provocation on the part of the victim prior to the victim's being shot. The Defendant did not render aid to the victim and instructed the eyewitness to leave before the authorities arrived. Accordingly, it is unlikely that the prosecutor's comments affected the jury's

- 25 -

decision, and consideration of the error is unnecessary to do substantial justice. See id. Thus, the Defendant is not entitled to relief regarding this issue.

### IV. Production of the Defendant's Wife's Second Statement

As his final issue, the Defendant argues that the State failed to disclose "the second statement" of the Defendant's wife pretrial despite there being an order in place instructing the State to provide all witness statements and that this failure amounts to plain error. The State responds that the Defendant's issue is waived because he fails to cite to any legal authority in support of his claim and, waiver notwithstanding, that the Defendant "cannot show any error from the State's failure to provide a witness's statement that the State was not obligated to disclose."

Prior to trial, on February 5, 2018, the Defendant filed a "Motion for Production of Witnesses/Witness Statements." Therein, the Defendant requested "[a]ll of the statements, whether in writing or however recorded and whether signed or unsigned, of any witness called to testify by the State which has not been previously disclosed," as well as requesting any narrative from a law enforcement officer or any police report prepared after having spoken with a potential witness in this matter. The trial court entered a case status order on February 12, 2018, wherein the parties agreed to the following: "State shall provide all witness statements, names of witnesses, and narratives from law enforcement officers within [seven] days of today."

The Defendant did not lodge any objection at trial regarding the State's alleged failure to disclose this second statement of the Defendant's wife. In the Defendant's motion for new trial, he argued that

> the State did not provide any documentation of the second statement given by [the Defendant's wife] in which she related to law enforcement that she and the Defendant had a conversation on the drive to their home on the evening in question and the contents of such conversation. Such failure to provide documentation surrounding this statement given to law enforcement constitutes plain error and gives rise to the necessity of a new trial in this matter.

At the motion for new trial hearing, defense counsel noted that the prosecutor asked a leading question that prompted the Defendant's wife to confirm such information. Defense counsel averred that pretrial disclosure of the statement was necessary for preparing the defense. According to defense counsel, because the statement came from a defense witness, and the defense unknowingly provided crucial evidence establishing premeditation, a manifest injustice occurred, and a new trial was warranted.

- 26 -

The prosecutor, in response, averred that there was "no law enforcement report, no statement to law enforcement in which [the Defendant's wife] relate[d] this incident on the ride home." The prosecutor further asserted that it was not required to turn over "work product" to the defense, as well noting that the Defendant's wife testified to her belief that she also provided defense counsel with such information. The prosecutor surmised that no discovery violation occurred.

The trial court found that the Defendant's wife testified that she provided the defense with the same information despite her equivocation and, also, that there was no written documentation of this second statement that was subject to disclosure. For these reasons, the trial court determined that the Defendant's issue was without merit.

On appeal, the Defendant alleges that the State's failure to provide this second statement constitutes plain error due to lack of compliance with the pretrial case status order. In the argument section of his brief, the Defendant acknowledges that "[u]nder normal circumstances, the statement of [the Defendant's wife] might not have been discoverable by the Defendant prior to trial under Rule 16 or Rule 26.2 of the Tennessee Rules of Criminal Procedure," but he continues, "The State's failure to do so constitutes plain error as it clearly violates a valid order of the [c]ourt to produce evidence that was agreed upon by the State." He does not specifically reference the plain error doctrine, and he does not argue any of the plain error factors.

The Defendant's brief is woefully lacking. He cites to no legal authority in support of his claim of error, including what rule of law he is travelling under for relief. Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court." We decline to delve into a dissertation on discovery rules without a modicum of guidance. The Defendant has waived this issue by failing to provide an adequate appellate brief. See also Tenn. R. App. P. 27(a)(7).

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

- 27 -